IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL JOHN CARR,

                        Plaintiff,                          CV-06-6060-ST

            v.                                              FINDINGS AND
                                                            RECOMMENDATIONS
CITY OF HILLSBORO, a municipal corporation;
HILLSBORO SCHOOL DISTRICT 1J,

                        Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

On March 19, 2004, plaintiff, Michael John Carr ("Carr"), was arrested in front of the

J.B. Thomas Middle School, in Hillsboro, Oregon.  On March 17, 2006, Carr filed this action,

alleging two claims against defendants the City of Hillsboro ("City") and Hillsboro School

District 1J ("School District").  In his First Claim, brought pursuant to 42 USC § 1983, Carr

alleges that defendants violated his constitutional rights to free speech, to practice his religion,

and to be free from unreasonable seizure of his person.  In his Second Claim, Carr alleges that

defendants jointly caused his false arrest.  Carr requests preliminary and permanent injunctions prohibiting defendants from excluding him from various public places in Hillsboro, $50,000.00 compensatory damages, costs and attorney fees.

This court has original jurisdiction under 28 USC § 1331 and supplemental jurisdiction under 28 USC § 1367.

All parties have now filed motions for summary judgment (City, docket #19; School District, docket #27; Carr, docket #28).  For the reasons set forth below, summary judgment should be granted in favor of the City and the School District.

## LEGAL STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The

court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).

## FACTS

A review of the parties' facts,[1] as well as the other materials submitted by the parties, including affidavits, declarations, and deposition excerpts,[2] reveals the following:

Carr believes he has a solemn religious obligation to spread the Gospel of Jesus Christ. Carr Decl, ¶ 2. In furtherance of that obligation, Carr engages in "open air preaching" on religious teachings and distributes educational religious literature, which he describes as "Christian comic booklets discussing various moral and religious themes." *Id*; Carr Depo, pp. 115-16. In the fall of 1997 or early 1998, Carr began engaging in his open air preaching at public middle and high schools in Hillsboro, Oregon. Carr Depo, p. 9. He has done this once or twice a year at most of those schools, but visits J.B. Thomas Middle School more regularly because of its convenient location on NE Lincoln Street between 6th and 8th Streets in Hillsboro. *Id* at 10-12.

---

[1] This court waived the requirement for a Concise Statement of Material Facts supporting a motion for summary judgment under Local Rule 56.1(a)(2). Minute Order dated September 20, 2006 (docket #13). Despite that waiver, all parties filed Concise Statements of Material Fact. *See* Concise Statement of Material Facts in Support of Defendant City of Hillsboro's Motion for Summary Judgment (docket #20); Defendant School District's Concise Statement of Material Facts (Attachment #2 to docket #27); and Plaintiff's Concise Statement of Material Facts (docket #30). Defendants responded to Carr's fact statement, but Carr did not respond to defendants' fact statements. City of Hillsboro's Response to Plaintiff's Concise Statement of Material Facts (docket #46); Response of Defendant School District to Plaintiff's Concise Statement of Facts (Attachment #2 to docket #48). Under Local Rule 56.1(f), facts set forth in fact statements or responses thereto are deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

[2] Both parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant or deponent, and citations are to the paragraph(s) of the affidavit or declaration or page(s) of the deposition transcript. Carr's exhibits were either conventionally filed or are attached to the Declaration of Daniel J. Stotter (docket #39) and the Third Declaration of Counsel Daniel J. Stotter (docket #68). The bulk of the School District's exhibits are attached to Defendant School District's Concise Statement of Material Facts (Attachment #2 to docket #27). References to those exhibits are to the exhibit number (School District's exhibits) or exhibit letter (Carr's exhibits). When affidavits and declarations are submitted as exhibits, the exhibit number or letter is provided with the first citation.

On March 19, 2004, Carr approached J.B. Thomas Middle School ("the school") just as the students were being dismissed for the day and were boarding approximately ten busses parked in front of the main school entrance. *Id* at 22.  Carr was dressed in full military fatigues and wearing a sandwich sign board that was a few inches wider than his body and extended from his breast bone down to an inch or two above his knees. *Id* at 17-18.  His pockets were bulging with pamphlets bearing religious messages.  He stood on the sidewalk in front of the school and began his preaching, loudly, albeit without amplification, "projecting [his] voice, in the form of a public speaker or performer, so that his words could be heard at this outdoor location."  Carr Supp Decl, ¶ 8.

A concrete walkway connects the front of the school to a city sidewalk (which is in the public right-of-way), running perpendicular to the walkway.  The edges of this walkway flare out prior to reaching the right-of-way line, creating a strip of concrete approximately eight feet wide on either side of the walkway where it adjoins the city sidewalk.  These adjoining concrete strips form a wider section of the "sidewalk," one side of which is within the public right-of-way and the other of which (approximately eight feet wide) is owned by the School District. *See* Filicky Decl, Ex A.  A "clearly visible joint or seam" is formed along the right-of-way line where the city sidewalk abuts the strip of concrete owned by the School District. *Id* at ¶ 6.  No other physical feature indicates that the portion of the "sidewalk" on the school side of the joint or seam is owned by the School District.

"[A]lmost immediately," school security guard, James Rush ("Rush"), whom Carr knew was connected with the school, approached Carr and asked him to cross the street.  Carr Depo, pp. 12, 19-23.  Carr responded by saying "No, I'm not crossing the street.  I'm on a public

sidewalk," then turned and walked away from Rush. *Id* at 23-24. During at least part of his conversation with Rush, Carr was on the portion of the "sidewalk" that is owned by the School District. Wagner Aff, Ex 3 (Rogers Depo), p. 3; Filicky Decl, ¶¶ 4-5 & Ex A; Overholt Suppl Decl, ¶ 3 & Ex A.

Rush then placed a radio call to the school's assistant principal, Rebecca Smith ("Smith"), telling her he had asked Carr to leave. Smith Depo, p. 60. Smith then approached Carr and also asked him to cross the street, telling him that he was on school property. Carr Depo, pp. 12, 28; Trial Transcript (Smith), p. 60. He responded that he was not on school property, was on a public sidewalk, and was not crossing the street. Carr Depo, p. 28. He then turned to the students, yelling that their administration or vice principal and their teachers wanted them to "burn in Hell." Trial Transcript (Smith), pp. 67-68. Some students ran back into the school building or ran up to Smith or other staff members and told them that Carr was frightening them, while other students "laughing and finding it humorous or entertaining" ran up to Carr to see what he was passing out. *Id* at 68-69, 78-79.

Smith asked Carr to leave the school premises at least three times over a five to ten minute period, during which time Carr continued his loud remarks. *Id* at 68, 70, 73. At that point, it was Smith's view that the "school premises" included the sidewalk because Carr was blocking students' path to busses. *Id* at 73-74. Smith finally radioed the main office and asked them to call the police. *Id* at 68, 70; Smith Depo (Carr Ex D), p. 39.

About five minutes later after all but three or four busses had driven away, Hillsboro police officers, including Melvin Ambrose ("Ambrose"), Megan Townsend ("Townsend"), and

Wendy Overholt ("Overholt")[3] arrived.  Trial Testimony (Smith), p. 68.  When they were dispatched to the school, the officers were told that the principal wanted officers to respond as quickly as possible and a man with possible mental problems was on school property near the sidewalk, wearing full army camouflage gear.  Ambrose Decl, ¶ 3.

When Ambrose arrived, he parked his car 150-200 feet away; when he got out of his car, he could hear Carr "basically yelling" his messages, including yelling "Choose Jesus.  Go to Heaven," and another statement about gay marriage being wrong.  Trial Transcript (Ambrose), pp. 26-27, 33-34.  At that time, about 150 people were in the area.  *Id* at 43.

Ambrose contacted Rush, who told him that Carr had been on school property, but had refused to leave after having been asked to do so several times.  Ambrose Decl, ¶ 6.  Ambrose asked Carr what he was doing and for identification.  Carr Depo, p. 35.  Carr refused to give his name or any identification to Ambrose and told him he was "exercising free speech."  *Id* at 36-37.  Carr then walked away from Ambrose, yelling louder than before.  Ambrose Decl, ¶ 7; Overholt Decl, ¶ 5.

Ambrose spoke with Overholt who said that Rush had also told her that Carr had been on school property before the police arrived, but refused Rush's repeated requests to leave.  Ambrose Decl, ¶ 8.  Ambrose then went a distance away from Carr to speak with Smith.  Carr Depo, p. 37.  Smith told Ambrose that Carr was blocking students from going to the busses.  Trial Testimony (Smith), p. 73.  In response to inquiries by Ambrose, Smith told Ambrose that Carr had been on school property and that she wanted to press charges.  Carr Depo, p. 38.  At

---

[3]  At that time, Overholt's last name was Ziervogel.  Overholt Decl, ¶ 2.  Since her submittals are in her present name (Overholt), this court refers to her by that name.

that point, Ambrose placed Carr in handcuffs and told him he was under arrest for the crime of

Trespass II (ORS 164.245)  *Id;* Ambrose Aff, ¶ 9.  Ambrose then turned Carr over to Townsend

and continued his investigation.  Ambrose Aff, ¶ 9.

During Ambrose's continuing investigation, either Rush or Smith, or both, told him that

Carr had arrived just as the school day ended and students were leaving through the front doors,

making their way toward 17 school busses parked at the front curb.  *Id* at ¶ 10.  Carr had

positioned himself on the main sidewalk of the school leading to the front doors so that students

had to walk around or by him to get to the busses; Carr's yelling had created a commotion which

disturbed the students and delayed the departure of busses; Carr had refused to leave the property

after several requests that he do so; and Carr got face-to-face with Rush and was yelling and

screaming at him.  *Id* at ¶ 10; Overholt Decl, ¶¶ 3-4.

Deputy District Attorney Kevin Kelley ("Kelley") independently determined that there

was probable cause to prosecute Carr.  Kelley filed a misdemeanor complaint against Carr in

Washington County Circuit Court on December 6, 2004, charging him with two counts of

disorderly conduct (one count regarding obstructing traffic and one count regarding noise) under

ORS 166.025.  Kelley Decl, ¶¶ 3-4 & Ex 1.  On May 13, 2005, Washington County Circuit

Court Judge Mark Gardner conducted a court trial regarding the charges against Carr.  Plaintiff's

Ex C.  Carr was acquitted of both counts of disorderly conduct.  Carr Decl, ¶ 8.

///

///

## **ANALYSIS**

### **I.  Entity Liability – Claims Under § 1983**

In their motions regarding Carr's constitutionally-based claims, the parties discuss at length the parameters of Carr's rights under both the First and Fourth Amendment, specifically whether Carr's speech was protected, whether defendants had a significant government interest in preventing Carr's activities, and whether defendants' actions were narrowly tailored to advance their reported interest in protecting middle school students. However, Carr's claims are brought solely against two public entities, the City and the School District. The record reveals woefully inadequate evidence to support liability against these entities. For this reason, this court need not and does not reach the vast majority of the constitutional arguments raised in the briefing.

A.  **Legal Standard – Entity Liability**

In *Monell v. Dep't of Social Servs. of City of New York,* 436 US 658 (1978), the Supreme Court decided that municipalities and other governmental bodies can be held liable under § 1983 when a municipal policy is the cause of an unconstitutional action taken by municipal employees. However, municipalities and other governmental bodies are "persons" subject to damages liability under § 1983 only where "action pursuant to official municipal policy of some nature cause[s] a constitutional tort." *Id* at 691. In other words, a municipality cannot be held liable for the acts of its employees based solely on the doctrine of *respondeat superior. Id.* Instead, liability exists only where the unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by municipal officers, or where the constitutional deprivation is visited pursuant to governmental "custom" even though such a custom has not received formal approval. *Id* at 690-91.

In order to impose § 1983 liability against a governmental entity, including against a school district, a plaintiff must rely on one of three theories:  "(1) that a[n] employee was acting pursuant to an expressly adopted official policy; (2) that a[n] employee was acting pursuant to a longstanding practice or custom; or (3) that a[n] employee was acting as a 'final policymaker.'" *Lytle v. Carl*, 382 F3d 978, 982 (9th Cir 2004) (citation omitted).  If relying on a "practice or custom," a plaintiff must demonstrate the existence of a "widespread custom of illegal and injurious discrimination." *Bryan County Comm'rs of Bryan County, Okl. v. Brown*, 520 US 397, 403 (1997).  The practices of the government officials must be "so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Monell,* 436 US at 690-91.  Proof of random acts or isolated events is insufficient to establish a custom.  *Thompson v. City of Los Angeles*, 885 F2d 1439, 1444 (9th Cir 1989).  Governmental entities cannot be liable without more than one incidence of a constitutional violation of a non-policy maker.  *Davis v. City of Ellensburg*, 869 F2d 1230, 1234 (9th Cir 1989).

An unconstitutional policy or custom need not be carried out by the municipality's official lawmakers to subject the municipality to liability.  Liability may lie against a municipality for the conduct of those whose edicts or acts may fairly be said to represent official policy.  *Pembaur v. Cincinnati*, 475 US 469, 480 (1986).  Thus, where final policy-making authority is delegated to an official who then acts pursuant to that delegated authority in a way that causes a constitutional violation, the municipality will be liable for the resulting injury.  *St. Louis v. Praprotnik*, 485 US 112, 130 (1988).  Whether an official has final policy-making authority for purposes of § 1983 is a question for the court to decide, with reference to state or local law as appropriate.  *Jett v. Dallas Indep. Sch Dist.*, 491 US 701, 737 (1989).

**B.  <u>Analysis – Entity Liability</u>**

Carr does not allege that either the City or the School District expressly adopted an official policy that caused his arrest or that a City or School District employee was acting as a final policymaker.  Thus, § 1983 liability against the City and the School District must rest on a custom or practice.  Both defendants argue that Carr has failed to establish any custom or practice that caused his alleged injuries.  This court agrees.

In support of his bid for entity liability against the City, Carr cites a letter that he allegedly sent to Ron Louie ("Louie"), the Chief of Police for the City of Hillsboro, on May 6, 2002.  In that letter, sent nearly two years prior to the incident at issue in this case, Carr informed Louie that on May 2, 2002, three police officers (presumably from the City of Hillsboro Police Department), approached him while he was standing on a public sidewalk in front of the Poynter Middle School (presumably in Hillsboro), "wearing a small sign board and passing out free literature to interested students."  Plaintiff's Ex. F, p. 1.  He informed Louie that the officers objected to Carr tape recording their conversation, even after they were "specifically informed" that he would be doing so, and objected to the officers having asked him for identification.  *Id* at 1-2.  He also told Louie that Hillsboro police officers had asked him for identification "at least five times or more before Thursday May 2nd, for the past seven years," in contrast to "other cities and towns [which] do not bother to send police cars" and whose officers "[o]ften . . . may drive by to observe what I am doing and keep on driving."  *Id* at 2-3.  He concludes by "politely requesting [that Louie] train the daytime and afternoon policemen concerning the legal right of a citizen to tape record a police officer after being 'specifically informed'" and advising Louie that

his "free speech activity should be well known in the City of Hillsboro by now" and that if

"these events I have outlined occur again, I plan to take legal action." *Id* at 3.

Similarly, with respect to the School District's liability, Carr cites a letter he allegedly

sent to Mario Alba ("Alba"), the principal of J.B. Thomas Junior High School, dated

November 17, 1999. Plaintiff's Ex G. In that letter, sent over four years prior to the incident at

issue in this case, Carr describes his visit (his sixth such visit in two years) to the public sidewalk

in front of the school on that date. The letter notes that Carr never approached students and that

students were free to walk up to him or pass him by. *Id* at 1. Alba apparently asked Carr to

move to the end of the sidewalk (which Carr refused to do), asked Carr his name (which Carr

refused to give), and told him that he was scaring the students (which Carr denied). *Id* at 1-2.

The letter then claims that Carr's "free speech activity is 100% perfectly legal," and declares as

"illegal . . . [Alba's] bullying tactics [and the actions of another school employee] who snatched

the literature right out of the hand of a student who freely asked for the information." *Id* at 3. It

concludes by encouraging Alba to contact the City of Hillsboro's attorneys, the Superintendent

of Schools, and City of Hillsboro City Hall "to determine who has jurisdiction over the <u>public</u>

sidewalk in front of the school." *Id* (emphasis in original).

Defendants's request to strike both of these exhibits for a variety of reasons is denied,

although admission into evidence is limited to establishing notice. However, even if admitted

for all purposes, the letters are patently insufficient to support entity liability against either the

City or the School District. At best, the letters describe Carr's version of two previous

encounters with police in front of two Hillsboro middle schools (one at J.B. Thomas Middle

School) which resulted in Carr being asked for identification and being asked to move down the

11 - FINDINGS AND RECOMMENDATIONS

sidewalk, but being issued no tickets and not being arrested.  The letters neither demonstrate any officially adopted City or School District policy nor any unconstitutional conduct by City or School District employees.  Instead, the letters simply state, in rather disputatious terms, Carr's opinions about his rights to roam what he deems to be public sidewalks, to tape record conversations with City and School District employees, and to hand out free literature to students.

Carr implies that the number of times the same response has followed his preaching activities (*i.e.* school officials first asking him to move or identify himself, then calling police officers who also ask him to move or identify himself) constitutes evidence of a custom or practice sufficient to support a *Monell* claim.  However, nothing in these documents indicates a custom or practice of unconstitutional conduct.  Carr testified that during his ten year history of preaching activities at Hillsboro schools, he has been contacted – but not arrested – by Hillsboro police officers between five and ten times.  Carr Depo, p. 121.  An additional five to ten times, police cars have driven by and the officers have not contacted Carr at all.  *Id*.  Despite multiple contacts between Carr and School District officials and/or police officers during the six years of Carr's open air preaching outside Hillsboro schools, Carr was never arrested except on the single occasion at issue here.  Moreover, Carr's own letter notes that at the time of the 1999 incident, Alba told Carr he was "scaring" the students, a contention echoed by Smith in her trial testimony in this case.  Carr has neither refuted this testimony nor the testimony that Smith told Ambrose that Carr's conduct was frightening students.  It is patently not unconstitutional for a school official concerned for the safety of students to contact the police and not unconstitutional for officers who have these same concerns to investigate.

12 - FINDINGS AND RECOMMENDATIONS

In response to defendants' arguments regarding lack of evidence to support entity liability, Carr also argues that the letters to Louie and Alba and the "admission" of Ambrose that Carr never ventured from the public sidewalk onto school property, combined with the fact that Carr was nevertheless arrested, supports a "custom or practice" of providing insufficient training as to First Amendment and public forum issues.  This argument suffers from several flaws.

First, the record reveals that Carr's contention that Ambrose admitted that he never ventured onto school property is inaccurate.  Ambrose testified that, during the time he was at the school, Carr never crossed the plane formed by an imaginary line extending across the concrete parallel to the school equidistant with the grass.  Trial Testimony (Ambrose), pp. 54-55.  Thus, that testimony is limited to that period of time after Ambrose arrived on the scene.  However, the dispatcher told responding police officers before Ambrose arrived at the school that the suspect was "standing just on the school's property by the sidewalk" (Plaintiff's Ex I) and the survey submitted by defendants indicates that a portion of the sidewalk which Carr assumes is "public" is in fact on School District property.  Filicky Decl, ¶¶ 4-5 and Ex A.

Second, even if Carr was never on school property, the present pleadings do not allege a claim based on a failure to train.

Third, assuming such a claim were alleged, Carr has failed to submit evidence to support such a theory.  A claim of failure to train requires the plaintiff to show that the failure to provide adequate training or supervision amounts to a policy or custom evidencing a deliberate indifference to the rights of persons with whom the police come into contact.  *See City of Canton, Ohio v. Harris*, 489 US 378, 380 (1989); *see also Merritt v. County of Los Angeles*, 875 F2d 765, 770 (9th Cir 1989).  This would require Carr to "establish a program-wide inadequacy

in training." *Alexander v. City and County of San Francisco*, 29 F3d 1355, 1367 (9th Cir 1994),

*cert denied*, 513 US 1083 (1995).  He cannot simply allege a specific type of training that he

believes the officers should have had.

> That a particular officer may be unsatisfactorily trained will not alone
> suffice to fasten liability on the city, for the officer's shortcomings may
> have resulted from factors other than a faulty training program.  It may be,
> for example, that an otherwise sound program has occasionally been
> negligently administered.  Neither will it suffice to prove that an injury or
> accident could have been avoided if an officer had had better or more
> training, sufficient to equip him to avoid the particular injury causing
> conduct.  Such a claim could be made about almost any encounter
> resulting in injury, yet not condemn the adequacy of the program to enable
> officers to respond properly to the usual and recurring situation with
> which they must deal.  And plainly, adequately trained officers
> occasionally make mistakes; the fact they do says little about the training
> program or the legal basis for holding the city liable.

*City of Canton*, 489 US at 390-91 (citations omitted); *see also Ting v. United States*, 927 F2d

1504, 1512 (9th Cir 1991) ("the fact that the agents may not have been trained in every

conceivable hostile arrest scenario . . . would not render the training inadequate.").

At best, Carr has identified a specific type of training he believes City and School District

officials should have had.  He offers no evidence, by way of an expert opinion or otherwise, that

the training program of the City or the School District is inadequate.  Instead, he simply cites the

fact of his own arrest to support that contention.  This will not carry the day for purposes of a

claim based on a failure to train.

Furthermore, a plaintiff must also show that the inadequate training program "actually

caused" the constitutional violation.  *City of Canton*, 489 US at 391.  Courts must ask:  "Would

the injury have been avoided had the employee been trained under a program that was not

deficient in that respect?"  *Id.*  Carr has failed to offer any evidence answering that question in

his favor.  To the contrary, as discussed below, the record reveals that his arrest was based upon probable cause that Carr trespassed on School District property, and his further detention was based on probable cause that he had committed the crime of disorderly conduct in violation of Oregon law.  Thus, the record does not support the conclusion that Carr would not have been arrested even had City and School District officials received different or further training on First Amendment and public forum issues.

In short, Carr has failed to garner sufficient evidence to proceed with a *Monell* claim against either the City or the School District.  Accordingly, Carr's § 1983 claim against the City and the School District should be dismissed for this reason, and this court need not and does not address the remaining arguments with regard to those claims.  Instead, this court turns to Carr's remaining claim for false arrest.

## II.  ** State Law Claim for False Arrest**

Carr contends that defendants jointly caused him to be unlawfully arrested and confined. Based on that joint conduct, he brings a supplemental state law claim for false arrest under 28 USC § 1367(a).  Based on the undisputed facts of this case and reasonable inferences to be drawn from those facts, this court concludes that Ambrose had probable cause to take Carr into and keep him in custody.

### A.  **Legal Standard – Arrest Must be Supported by Probable Cause**

In Oregon, false arrest and false imprisonment do not constitute separate tort claims.  *See Hiber v. Creditors Collection Serv., Inc.*, 154 Or App 408, 413, 961 P2d 898, 901, *rev denied*, 327 Or 621, 971 P2d 413 (1998) (citation omitted) (recognizing that in Oregon, an action for false imprisonment is also called false arrest).  The gravamen of a false imprisonment or false

arrest claim is "the unlawful imposition of restraint on another's freedom of movement." *Buckel v. Nunn*, 133 Or App 399, 405, 891 P2d 16, 21 (1995), quoting *Walker v. City of Portland*, 71 Or App 693, 697, 693 P2d 1349 (1985).  Both torts require proof of four elements: "(1) defendant must confine plaintiff; (2) defendant must intend the act that causes the confinement; (3) plaintiff must be aware of the confinement; and (4) the confinement must be unlawful." *Hiber* 154 Or App at 413, 961 P2d at 901 (citations omitted) (false imprisonment); *Ross v. City of Eugene*, 151 Or App 656, 663, 950 P2d 372, 375 (1997) (false arrest).  The defendant "must only intend to accomplish the act that causes confinement; they need not intend the confinement to be unlawful." *Oviatt By and Through Waugh v. Pearce,* 954 F2d 1470, 1479 (9th Cir 1992) (interpreting Oregon law).

In an action for false arrest or false imprisonment, the plaintiff has the burden to show the imprisonment.  *Ross*, 151 Or App at 663, 950 P2d at 375.  The burden then shifts to the defendant to show that the imprisonment was not unlawful.  *Id* (citation omitted).  In Oregon, an officer has probable cause to arrest if "there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." *See State v. Makuch*, 340 Or 658, 667, 136 P3d 35, 40 (2006), citing ORS 131.005(11). "[W]here the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts, it is appropriate for this court to decide whether probable cause existed . . . ." *Peng v. Mei Chin Penghu*, 335 F3d 970, 979-80 (9th Cir 2003), *cert. denied*, 540 US 1218 (2004).

///

///

16 - FINDINGS AND RECOMMENDATIONS

B. **Analysis – State Law Claim for False Arrest**

Carr contends that his arrest and confinement without probable cause constituted false arrest. While there is no dispute that he was arrested and confined, defendants contend that Carr has failed to show a genuine issue of material fact as to whether the confinement was unlawful. ORS 133.310(1) authorizes a peace officer to "arrest a person without a warrant if the officer has probable cause to believe that the person has committed . . . (b) A misdemeanor."

A person commits the crime of criminal trespass in the second degree if he or she "enters or remains unlawfully . . . in or upon premises." ORS 164.245(1). A person commits the crime of disorderly conduct in the second degree if he or she intends to create or recklessly creates a risk of public inconvenience, annoyance or alarm by: "(a) Engag[ing] in fighting or in violent, tumultuous or threatening behavior; (b) Mak[ing] unreasonable noise; (c) Disturb[ing] any lawful assembly of persons without lawful authority; [or] (d) Obstruct[ing] vehicular or pedestrian traffic on a public way." ORS 166.025(1)(a)-(d). Both criminal trespass in the second degree and disorderly conduct in the second degree are misdemeanors. ORS 164.245(2) (criminal trespass in the second degree is a Class C misdemeanor); ORS 166.025(2) (disorderly conduct in the second degree is a Class B misdemeanor).

It is undisputed that dispatch relayed to the responding officers that a man with possible mental problems was on school property near the sidewalk wearing full army camouflage gear. It is also undisputed that Smith told Ambrose that Carr had been on and refused to leave school property and that she wanted to press charges. Finally, it is undisputed that Overholt told Ambrose that, according to Rush, Carr had been on school property and refused to leave despite repeated requests that he do so. The only reasonable inference that can be drawn from this

17 - FINDINGS AND RECOMMENDATIONS

evidence is that Ambrose initially had probable cause to arrest Carr for criminal trespass, thus

obviating this initial arrest as a basis for a false arrest claim.

Carr acknowledges that Ambrose may have had some initial concerns about the

possibility of a school shooting based on his choice of attire, bulging pockets, and large religious

sign board which made it impossible to tell whether he had weapons.  He also concedes that

"there was apparently some initial confusion as to whether [he] had 'trespassed' onto school

property."  Plaintiff's Response to City of Hillsboro's Motion for Summary Judgment, p. 5.

However, Carr argues that all of those concerns should have been allayed by Ambrose's further

investigation.

Carr was not charged with criminal trespass as a result of this March 19, 2004 encounter

at J.B. Thomas Middle School,[4] which lends some credence to his theory that Ambrose

determined that there was no factual basis for this charge.  Thus, Carr's false arrest claim turns

on whether there was probable cause to keep him in custody on some other basis once the

underlying predicate for the criminal trespass charge (that he had been on school property) was

discovered to be inaccurate.  Defendants contend that Carr was properly held in custody because

there was probable cause to arrest him for disorderly conduct in the second degree.

The undisputed evidence is that after Ambrose placed Carr in handcuffs and continued

his investigation, Rush and Smith, or both, told him that Carr had positioned himself between the

front school door so that students had to make their way around him in order to get to the busses

that were parked at the front curb and that Carr's yelling had created a commotion which

---

[4]  As a result of another incident at the same school nearly one year later on March 10, 2005, Carr was convicted on
June 3, 2005, of Criminal Trespass 2, and sentenced to five years of bench probation.  Defs' Ex. 7.  As part of that probation, the
court ordered that Carr "not be on [the] North sidewalk of Lincoln Street between 6th Ave and 8th Ave in Hillsboro."  Id.  The
parties advise that an appeal of that ruling is pending before the Oregon Court of Appeals.

disturbed the students and delayed the departure of busses.  They also told Ambrose that, in response to Rush's request that Carr leave that location, Carr got face-to-face with Rush and was yelling and screaming at him.  Previous to that, Carr had flatly refused Ambrose's request that he identify himself, telling Ambrose that he was "exercising free speech," then walking away from Ambrose, yelling more loudly than before.  The only reasonable inference that can be drawn from this evidence is that Ambrose's continued detention of Carr was supported by probable cause that he committed the crime of disorderly conduct in the second degree, thus obviating this remaining detention as a basis for a false arrest claim.

Carr counters that he was acquitted of both counts of disorderly conduct with which he was charged.  However, probable cause to arrest for any crime is a complete defense to a common law action for false arrest.  *Bacon v. City of Tigard*, 81 Or App 147, 149-50, 724 P2d 885, 886 (1986).  Thus, the issue is not whether Carr was convicted, but whether probable cause supported his arrest in the first instance.  As discussed above, the only reasonable inference from the undisputed evidence is that probable cause existed to believe Carr had committed the crime of disorderly conduct in the second degree.

Carr insists that his conduct was constitutionally protected because he was simply expressing his religious beliefs on a public sidewalk, a classic First Amendment activity in a traditional public forum.  However, even assuming that Carr remained at all times on the public portion of the sidewalk adjoining the school, that argument fails based on the record before this court.

The First Amendment does not provide an unfettered right to conduct expressive activities in any forum under any circumstances.  In the context of public sidewalks adjoining

school property, expressive activity which causes a material disruption to normal school activities may be curtailed without running afoul of the First Amendment. *Grayned v. City of Rockford*, 408 US 104, 118-19 (1972). Disruptions "immediately after school can affect the school's learning environment and [therefore] leaving school can properly be considered a 'normal school activity' for a junior high school." *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F3d 1198, 1205 (10th Cir 2002). Here, the undisputed evidence is that Carr's conduct of positioning himself between the school doors and the busses delayed the departure of several busses and that his conduct caused a commotion, frightening some students and causing others to become distracted from getting either onto busses or otherwise on their way home. Carr cannot shield this disturbance to normal school activities from the criminal consequences it supports by waving the First Amendment flag. He, therefore, has no constitutional basis on which to undercut the probable cause determination supporting his arrest.

Carr's state law claim for false arrest fails because his conduct is not shielded by the First Amendment, and the undisputed facts show that Ambrose's continued detention of Carr was supported by probable cause to believe Carr had committed the crime of disorderly conduct in the second degree. Therefore, defendants should be granted summary judgment against Carr's state law false arrest claim

///

///

///

## **RECOMMENDATIONS**

For the reasons set forth above, both motions for summary judgment by the City (docket #19) and the School District (docket #27) should be GRANTED and Carr's Motion for Partial Summary Judgment (docket #28) should be DENIED.  As a result, a judgment should be entered dismissing this case with prejudice.

## <u>SCHEDULING ORDER</u>

Objections to the Findings and Recommendations, if any, are due April 5, 2007.  If objections are filed, then the Findings and Recommendations will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will be referred to a district judge and go under advisement.

DATED this 19th of March, 2007.

/s/  Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge